IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JEREMIAH CHAMBERLAIN, | ) | |
| Plaintiff, | ) | Civil Case No. 7:20-cv-00045 |
| v. | ) | |
| | ) | |
| VIRGINIA DEPARTMENT OF | ) | By: Elizabeth K. Dillon |
| CORRECTIONS, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Jeremiah Chamberlain, a Virginia inmate proceeding *pro se*, brought this civil rights action

against the Virginia Department of Corrections (VDOC), its director, Harold Clarke, and a number

of other individual defendants.  His amended complaint (Dkt. No. 27) alleges that he suffers from

opioid use disorder (OUD) and that defendants deny him proper medications to treat OUD.  He

contends that denying medication-assisted treatment (MAT)—and, in particular—methadone and

buprenorphine—constitutes discrimination against him based on his OUD, results in unnecessary

and painful opioid withdrawal (when he obtains and uses opioids illegally while incarcerated), leads

to an increased risk of relapse and overdose death, and makes him a target by increasing the

likelihood that he will owe debts to other prisoners who distribute drugs.

Pending before the court are a number of motions, including defendants' motion for

summary judgment as to all claims.  For the reasons discussed below, the court will grant the

motion for summary judgment as to all of Chamberlain's claims except his Eighth Amendment

claim.[1]  As to that claim only, Chamberlain is entitled to some of the discovery he seeks before the

---

[1] Some of the defendants likely are entitled to summary judgment on Chamberlain's Eighth Amendment claim because he has not provided sufficient evidence to show that they had personal knowledge about the risks he faced or to show that they were involved in the decision to deny Chamberlain treatment.  But aside from a general statement that Chamberlain failed to allege "that any defendant personally implemented a policy prohibiting his access to MAT or appropriate mental and medical treatment" (Dkt. No. 68 at 19), and a statement that the alleged involvement of defendants Marano and Counts was limited to the ADA claim (*id.* at 11), defendants' motion does not delineate between defendants on this basis.  Accordingly, the court will not parse out defendants as to this claim at this time.

court rules on that motion.[2]  Accordingly, the court will deny the motion without prejudice as to his Eighth Amendment claim (and as to defendants' request for qualified immunity on that claim) and direct defendants to file a new summary judgment motion on that claim within forty-five days.  As part of that summary judgment filing, defendants shall address specifically Chamberlain's allegations regarding his more recent medical treatment, relapses, need for medications to assist with physical dependency, as well as his allegations regarding changes to VDOC substance-abuse programs and the use of MAT.  The court also will require defendants to respond to Chamberlain's motion for preliminary injunction (Dkt. No. 85) within forty-five days.

 As for Chamberlain's other motions, some must be addressed prior to ruling on the summary judgment motion, and others will be denied or denied as moot.  All of the court's rulings are discussed in more detail herein.

## I.  BACKGROUND

The court briefly outlines the allegations in Chamberlain's amended complaint here, discusses the various affidavits of his treating psychiatrist, Dr. McDuffie, and sets forth the evidence before the court regarding VDOC's options for MAT.  Some other factual evidence that is part of the summary judgment record is addressed in context elsewhere in the opinion.

### A.  Chamberlain's Amended Complaint

Chamberlain's amended complaint (Dkt. No. 27) is lengthy and contains detailed background information about the opioid epidemic in the country and in Virginia, complete with citations to various secondary sources.  The amended complaint also discusses OUD and MAT, which Chamberlain describes as an "evidence-based standard of care for treatment of OUD."  He

---

[2]   The discovery he seeks would have no bearing on the reasons that summary judgment is appropriate as to the remainder of his claims.

states that MAT, "including buprenorphine and methadone, are lifesaving medications." (Am. Compl. ¶ 8.) According to Chamberlain, VDOC has a blanket policy prohibiting MAT except as to pregnant women or others who, although subject to VDOC authority, are housed outside of VDOC facilities (such as offenders at local jails, halfway houses, or on parole, probation, or supervision). (*Id.* ¶¶ 9, 112.)

Chamberlain's complaint also details his own history of addiction, beginning with heroin at age 14. (Am. Compl. ¶¶ 65–77.) He claims that his addiction led to all of the criminal behavior for which he has been imprisoned. While serving a prior criminal sentence, he continued to use opioids and, after he was released from VDOC custody on December 31, 2007, he was using heroin again within ten months.

In January 2011, he sought treatment as an outpatient for his addiction and was prescribed methadone. He claims that he was relieved of his opioid cravings, and his family described the difference as "night and day." (*Id.* ¶ 72.) In May 2011, facing minor misdemeanor charges, Chamberlain began eluding the police, primarily because he wanted to avoid being incarcerated without bail and forced to withdraw from methadone. He says he tried to stop the use of the methadone with the help of family and friends, but "while in the throes of withdrawal" he grabbed his mother's firearm and confronted the police in an attempt at suicide. He was shot by the police and charged with attempted capital murder. (*Id.* ¶¶ 73–74.)

Thereafter, Chamberlain underwent several surgeries and was prescribed narcotic pain medications while in jail for several years until June 2013 when he was transferred to a VDOC facility. He claims that, because of his withdrawal symptoms, he continually sought illicit opioids while in prison and eventually got caught. He failed ten drug tests over a period of four years but was consistently told either that he was on the waiting list for drug treatment or that there were no

programs available.  He states that he "discovered in July 2019" that OUD was a protected

condition under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and that

treatment was "mandated, not optional."  (*Id.* ¶ 77.)

The amended complaint names the following defendants:

1. Virginia Department of Correction;
2. Harold Clarke, the Director of VDOC;
3. A. David Robinson, the Chief of Corrections Operations for VDOC;
4. H. Scott Richeson, the Deputy Director of Programs, Education, and Re-entry for VDOC;
5. Dr. Steven Herrick, the Director of Health Services for VDOC;
6. B. Marano, the ADA Coordinator for VDOC;
7. Denise Malone, the Chief of Mental Health Services for VDOC;
8. Kathryn Hartka, a former VDOC employee who was the Medication-Assisted Treatment Coordinator for the Reentry Unit of VDOC from January 10, 2020 until November 2, 2020; and
9. M. Counts, the Institutional Operations Manager for ROSP.

As noted, Chamberlain's amended complaint contains four counts, and it appears that all

four counts are brought against all defendants.  In Counts One and Two, Chamberlain alleges that

OUD is a disability, and he claims that defendants' policies of denying MAT violate, respectively,

the ADA and Section 504 of the Rehabilitation Act (RA), codified at 29 U.S.C. § 794.  In Count III,

he contends that the denial of MAT constitutes deliberate indifference to his serious medical needs

in violation of the Eighth Amendment.  Count IV alleges that defendants' practice and policy of

denying him MAT is a violation of his rights under the Equal Protection Clause of the Fourteenth

Amendment.  This claim appears to be based on an allegation that other inmates "under the

authority of VDOC" including those in local jails, halfway houses, on parole, probation, and

supervision, are allowed or required to participate in MAT, but he is not, as well as a claim that

certain female offenders receive the medications he has been denied.

**B.  VDOC's Policies Concerning MAT**

As part of their opposition to Chamberlain's first motion for preliminary injunction—which

sought a court order directing that he be given either methadone or buprenorphine, defendants set forth the VDOC policy at that time regarding MAT.  In their affidavits, Drs. McDuffie and Hartka both noted that methadone and buprenorphine (also known under the brand name Suboxone) must be administered in accordance with federal guidelines and are not available in any VDOC facility. (McDuffie 1st Aff. ¶ 10, Dkt. No. 36-2; Hartka Aff. ¶ 5, Dkt. No. 36-3.)  VDOC had MAT pilot programs using a naltrexone injection (Vivitrol), and those pilot programs were offered as part of an intensive drug treatment program at Indian Creek Correctional Center.  That program was limited to certain security level offenders (Level 2 and below), however, and was offered only during the 18 to 24 months immediately prior to the offender's release.[3]  For participating offenders, the Vivitrol was given in a long-lasting injection one week prior to release and might continue for the first twelve months of supervision.  (Robinson Aff. ¶ 11, Dkt. No. 36-1; Hartka Aff. ¶¶ 4–5.) Defendants further emphasized that all of VDOC's "in-custody intensive substance abuse treatment programs are consistent with the Federal Bureau of Justice Assistance standards as well as American Correctional Center standards."  (Robinson Aff. ¶ 4.)  VDOC relied on those same affidavits to support their summary judgment motion, which was filed in November 2020.

In more recent filings, though, Chamberlain has offered his own sworn testimony that VDOC's policies concerning MAT have expanded since those affidavits were signed.  In particular, he claims that VDOC now utilizes the use of buprenorphine (Suboxone) in three VDOC facilities— Indian Creek, Central Va. Correctional Unit #13, and Va. Correctional Center for Women. (Proposed 2nd Am. Compl. ¶¶ 47, 56–57, 69–70, Dkt. No. 83-1.)  He also states that VDOC now offers naltrexone in all VDOC facilities on a "case-by-case basis."  (Id. ¶ 47.)  In an affidavit he

---

[3] At the time he filed suit, Chamberlain was a security level 5 offender, although at some point, his level was reduced to a 3.  (See generally ECF No. 85.)  His expected release date is 2047.  Accordingly, he does not meet either of those criteria.

submits by another prisoner, that prisoner, too, says that there was no substance abuse treatment program at Red Onion State Prison from 2012 until March 2020, until after Chamberlain filed his lawsuit, but there now is such a program.  (Christopher Walthall Aff. ¶ 5, Dkt. No. 74-2.)

**C.   Chamberlain's Treatment for OUD and Attempts to Obtain MAT**

Chamberlain first requested MAT treatment in July 2019 and alleges that his requests "were answered with derision and disdain," although he does not say by whom. (Reply in Support of Pl.'s 1st Mot. Prelim. Inj. 4, Dkt. No. 49.)  Shortly thereafter, Chamberlain was moved to Red Onion State Prison and placed in segregation while awaiting classification, where he suffered significant acute withdrawal symptoms.  He first requested to see a psychiatrist at Red Onion in January 2020, and there had been no documented need for mental health treatment for him within the prior two years.  (McDuffie 1st Aff. ¶ 5, Dkt. No. 36-2.)  At that time, he was prescribed Lithium and Thorazine for his posttraumatic stress disorder (PTSD) and borderline personality disorder.  (*Id.* ¶ 6.)  In February 2020, Chamberlain requested to live in a mental health pod and again requested MAT for his opioid addiction.

According to Dr. McDuffie, he met with Chamberlain and discussed the naltrexone injection (Vivitrol), but it was never prescribed.  Dr. McDuffie avers that he never informed Chamberlain that Vivitrol was unavailable or that Dr. McDuffie had requested it for Chamberlain and it had been denied due to cost.  Chamberlain consented to and was prescribed the daily, oral version of naltrexone (known under the brand name ReVia), which is also a drug used to treat opioid addiction.  The oral naltrexone has potential side effects that Chamberlain wanted to avoid; however, in Dr. McDuffie's medical opinion, the potential side effects did not present any excessive risks in comparison to the potential treatment benefit.  After being prescribed the oral naltrexone, Chamberlain stopped taking the medication within a week, reporting that it made him feel weak and amplified the chronic pain he reports having in his upper extremity.  (*Id.* ¶ 8.)  In his most recent

affidavit, executed in October 2020, Dr. McDuffie avers that "if Chamberlain were to stay on naltrexone orally for a month," then Dr. McDuffie has "received approval for him to start the naltrexone injection (known under the brand name Vivitrol) as an alternative to methadone." (McDuffie 3rd Affidavit ¶ 6, Dkt. No. 62-1.)

Chamberlain insists that the naltrexone does not work for him and causes significant pain symptoms, which he has expressed to Dr. McDuffie and others.  He also states that it was tried twice before he filed suit and was stopped "due to significant adverse reactions."  (Proposed 2nd Am. Compl. ¶ 64.)  Although he does not provide a date, Chamberlain also states that he subsequently relapsed and became physically dependent on opioids, which required the use of clonidine to medically assist his withdrawal.[4]  He also states that naltrexone has been "documented as an intolerable and inappropriate treatment," presumably in his medical records.  (*Id.* ¶ 65.)

**D.  Dr. McDuffie's Testimony and the Court's Order to Show Cause**

The court previously denied Chamberlain's initial motion for preliminary injunction, relying in large part on the affidavit of Dr. McDuffie.  In  particular, the court noted the testimony from Dr. McDuffie that he had prescribed Chamberlain the daily, oral version of naltrexone, which is a drug used to treat opioid addition.  McDuffie believed that potential side effects did not present any excessive risks in comparison to the potential treatment benefit.  But Chamberlain stopped taking the medication within a week, reporting that it made him feel weak and amplified his chronic pain. Dr. McDuffie also offered his professional opinion as a psychiatrist that Chamberlain did not need the medications he requested in his motion for preliminary injunction—methadone or buprenorphine—to treat either his opioid addition or his borderline personality disorder.  (McDuffie

---

[4] By contrast, Dr. McDuffie said in his third affidavit, signed in October 2020, that he had "never seen Chamberlain present with any signs of physical withdrawal or anything to indicate he is currently physically dependent on opioids."  (McDuffie 3rd Aff. ¶ 5.)

1st Aff. ¶ 10.)

After that denial, Chamberlain submitted a different affidavit from Dr. McDuffie, which appeared to have been drafted by Chamberlain but was edited and signed by Dr. McDuffie.  Some of the testimony in the second affidavit seemed in tension with Dr. McDuffie's earlier affidavit testimony, upon which the court had relied to deny the preliminary injunction.  (*See* McDuffie 2nd Aff., Dkt. No. 53.)  Specifically, his second affidavit included the following testimony:

> Chamberlain has stated that his most successful experience was with methadone.  The American Society of Addiction Medicine (ASAM) issued a national practice guideline for the use of medications in the treatment of opioid addiction which states:  ["]Methadone should be reinstituted immediately if relapse occurs or when an assessment determines that the risk of relapse is high for patients who previously received methadone in the treatment of opioid use disorder, but who are no longer participating in methadone maintenance treatment.["]  I am inclined to agree with these guidelines and believe Chamberlain would benefit being returned to a methadone maintenance program[.]  However, I am precluded from providing this due to VADOC policy and Federal Regulations.

(McDuffie 2nd Aff. ¶ 9.)

In the same affidavit, Dr. McDuffie stated that he was "inclined to agree with" several statements from the National Commission on Correctional Health Care (NCCHC).  These include one that discusses the risks and consequences of drug use in correctional facilities and states that "effective treatment for substance abuse disorders including long-term [MAT] has been shown to reduce these problems in Correctional Institutions" and another that says, "[W]hile both methadone and buprenorphine treatments pose some risk of diversion within prisons and jails, some evidence suggests that overall rates of illicit drug use decline following introduction of MAT."  (*Id.* ¶¶ 10, 12–13.)  Dr. McDuffie further avers that he is

> precluded from prescribing these treatments to Chamberlain due to VADOC policy and federal regulations and an on-going development of a treatment program.  Should my supervisor or VADOC change their position and policy and allow it, I would be willing to prescribe

8

> and supervise Chamberlain's treatment with the available medications
> approved for OUD, not limited to buprenorphine and methadone if
> regulations change.  Until such changes are implemented, I am
> limited to what I can utilize to treat Chamberlain.  Again, I believe
> Chamberlain would benefit from treatment using methadone or
> buprenorphine in conjunction with the cognitive based therapy.
> Naltrexone IM is now available but tolerance on oral formulation
> must be established and a retrial of this plan is possible.

(*Id.* ¶¶ 13–14.)

In light of these statements, the court directed defendants to show cause as to why the

court's order denying preliminary injunction should not be vacated (Dkt. No. 56), and they

responded and provided yet another affidavit from Dr. McDuffie, which they says explains any

perceived discrepancy between his first two.

Specifically, Dr. McDuffie's third affidavit, executed on October 13, 2020, references both

of his earlier affidavits and states that his "professional opinion has consistently been, and continues

to remain, that it is not medically necessary for Chamberlain to receive either buprenorphine or

methadone at this time."  (*Id.* ¶ 3; *see also id.* ¶ 7 (repeating same).)  He explains that Chamberlain

has cravings triggered by reminders of opioid use, but states that he has "never seen Chamberlain

present with any signs of physical withdrawal or anything to indicate he is currently physically

dependent on opioids."  (*Id.* ¶ 5.)

Dr. McDuffie also avers in his third affidavit that the preferred medication for treating

Chamberlain's opioid cravings would be naltrexone (orally or by injection).  He states that

"buprenorphine has a high risk of being abused and diversion within correctional populations" and

that his professional opinion is that it is not an appropriate treatment for Chamberlain.  He also

states that in some settings, a methadone maintenance program might be appropriate for

Chamberlain, but that "methadone may only be distributed . . . .by a federally certified opioid

program."  (*Id.*)

He then explains that "if Chamberlain were to stay on naltrexone orally for a month," then Dr. McDuffie has "received approval for him to start the naltrexone injection (known under the brand name Vivitrol) as an alternative to methadone." (*Id.* ¶ 6.)  He emphasizes that "it is ***not*** my professional opinion that it is medically necessary for Chamberlain to receive methadone or naltrexone.  Methadone is not available, nor is it an essential element for Chamberlain's treatment, but naltrexone is available where Chamberlain is currently housed." (*Id.*)

The court acknowledges that Dr. McDuffie has never said that methadone or buprenorphine was medically necessary for Chamberlain, and his latest affidavit insists that he has consistently held the opinion that neither is medically necessary.  But Dr. McDuffie's various statements still have seeming inconsistencies.  Most notably, in his second affidavit, he states that **"**I believe Chamberlain would benefit from treatment using methadone or buprenorphine in conjunction with the cognitive based therapy."  In contrast, he states in his third affidavit that buprenorphine is not an appropriate treatment for Chamberlain's opioid cravings, apparently because buprenorphine has a high risk of being abused and diverted within a prison setting.

Defendants have offered a way to harmonize these two statements.  Specifically, they argue that these two statements are not in conflict because Dr. McDuffie's second affidavit did not state that either of these medications is appropriate for Chamberlain *currently* in his present circumstances.  (Dkt. No. 62 at 7.)  Put differently, defendants argue that Dr. McDuffie's testimony, taken in total, should be interpreted to mean that Chamberlain would benefit from treatment using buprenorphine, but that it is nonetheless inappropriate for him *at this time*, because he is incarcerated.  Similarly, they contend that "in some setting[s]," methadone might be an appropriate treatment, but not in Chamberlain's *current circumstances*, since methadone can only be distributed by a federally certified opioid treatment program and is not available to any VDOC prisoners.  Dr.

10

McDuffie does not make that distinction, but he does state that he has consistently maintained that

neither is medically necessary and that there is a medication available to treat Chamberlain, which

Dr. McDuffie—at least at the time he executed his third affidavit—believed is the most appropriate

treatment for Chamberlain.

## II. RULINGS ON NON-DISPOSITIVE MOTIONS

Before turning to defendants' motion for summary judgment (Dkt. Nos. 67), the court

addresses a number of other pending motions filed by Chamberlain.  Some of his motions are

unnecessary to address, in light of the court's ruling on summary judgment and other motions, and

will be denied as moot.  Several of Chamberlain's motions, however, can—or must—be addressed

as a preliminary matter.[5]

## A.   Motion to Amend with Proposed "Supplemental Complaint" (Dkt. No. 83)

After defendants' filed their summary judgment motion, Chamberlain sought leave to file a

proposed complaint that he describes as "supplemental."  (Dkt. No. 83.)  This proposed

supplemental complaint is more properly viewed as a proposed second amended complaint, though,

because it would replace his amended complaint and incorporates by reference certain portions of it.

Chamberlain does not provide a lot of detail as to the differences between his amended

complaint and proposed second amended complaint.  He simply summarizes that he is naming

additional parties, incorporating additional exhibits, and explaining "further events and changes

which have occurred since the initial filing of this action."  (Dkt. No. 83.)  The court has reviewed

the proposed second amended complaint and compared it to the current amended complaint.  It still

asserts the same four claims as his amended complaint.  Moreover, it is largely duplicative of the

---

[5] Many of these motions are currently referred to the assigned United States Magistrate Judge, but the court will withdraw the reference of all pending motions and will rule on them herein.

current amended complaint, but—consistent with the court's prior dismissal of any class action

claims—it removes most of the class-related allegations.  It also adds some additional material.

Among other changes, the proposed second amended complaint:

1. Seeks to adds two parties: Meredith Carey and Mike Fatula, who Chamberlain identifies,

   respectively, as VDOC's chief supervisor of the psychiatric staff and VDOC's current

   MAT Coordinator (who replaced defendant Hartka in that position) (Proposed 2nd Am.

   Compl. 1, Dkt. No. 83-1; *id.* ¶¶ 24, 28);

2. Provides additional information about the role defendant Marano played (*id.* ¶ 26);

3. Provides new, different, or updated facts or numbers related to OUD or the opioid

   epidemic generally, the opioid epidemic within VDOC, and the efficacy of MAT (*id.*,

   ¶¶ 4–6, 32–33);

4. Includes references to the Rehabilitation Act where previously only the ADA had been

   mentioned (*see, e.g.*, *id.* ¶¶ 11, 39);

5. Contains expanded jurisdictional statements (*id.* ¶¶ 14–16);

6. Contains additional and updated allegations concerning Chamberlain's opioid use,

   relapses, and treatment while in VDOC custody and since the filing of this action (*id.*

   ¶¶ 37, 44–45, 48, 59, 61, 65–68, 77–83), including that he has had to be medically

   assisted with withdrawal on a recurrent basis, which "shows he has regular access to

   dangerous opioids and clearly cannot control himself due to the severity of his OUD"

   and that he has the "same substantial risk of overdose as the pre-release VDOC

   prisoners" who are eligible for MAT;[6] and

---

[6] Specifically, Chamberlain states that after service of this suit on defendants in March 2020, Chamberlain "was provided naltrexone which had significant adverse reactions, and was stopped.  Chamberlain was then placed on a medication tenex, again due to significant adverse reactions, it [too] was stopped. Chamberlain then relapsed and became physically dependent on opioids, which required the use of clonidine to medically assist his withdrawal.  [That]

7. Provides updated information about VDOC's policies with regard to MAT.  Specifically, as noted, Chamberlain alleges that, since the filing of the action, VDOC began prescribing suboxone to pre-release prisoners in 3 VDOC facilities:  Indian Creek Correctional Center, Central Virginia Correction Unit #13, and Virginia Correctional Center for Women, and also made "Naltrexone, a formulary medication," available "statewide on a case-by-case basis" (*id.* ¶ 47; *see also id.* ¶¶ 56, 70).[7]  Chamberlain claims that defendants are "actively reversing their positions and policies regarding MAT for OUD . . . [but] are still discriminating against Chamberlain" (*id.* ¶ 57).

"The court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), although leave to amend may be denied, among other circumstances, where "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile."  *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).  An amendment is considered futile if the amended complaint could not survive a motion to dismiss under Rule 12(b)(6). *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).

Defendants have not responded to the motion to amend, and the court notes that many of Chamberlain's proposed amendments will not alter the court's rulings on his claims.  In particular, nothing in the second amended complaint affects the court's decision, discussed in more detail below, that defendants are entitled to summary judgment as to Chamberlain's ADA, RA, and Equal

---

then led to the second trial of naltrexone.  However, . . . Chamberlain's physical withdrawal symptoms [led] Chamberlain to consume more opioids, and again the naltrexone was immediately discontinued, and documented as an intolerable and inappropriate treatment."  (Proposed 2nd Am. Compl. ¶¶ 64–65, Dkt. No. 83-1.)

[7] Chamberlain also alleges that "prior to the filing and service of this action, the defendants maintained the position that *no* VDOC prisoners received any such treatments within *any* VDOC facilities (*see* Robinson Aff. and Hartka Aff., Dkt. No. 36); but now, these statements are no longer accurate."  (Proposed 2nd Am. Compl. ¶ 57; *see also id.* ¶ 70.)

Protection claims.  Nonetheless, the proposed second amended complaint provides additional and updated facts both about Chamberlain's treatment since the filing of the complaint and about alleged changes to VDOC policy.

Because they failed to respond to his motion to amend, moreover, defendants have not presented any information to suggest that allowing amendment would be prejudicial to them or that the amendments are futile, as it relates to his Eighth Amendment claim.  Moreover, because Chamberlain's proposed second amended complaint is verified, the allegations in it would be treated by the court, if based on personal knowledge, as facts offered in opposition to defendants' summary judgment motion.  *Cf. Goodman v. Diggs*, 986 F 3d 493, 499 (4th Cir. 2021) (explaining that a verified complaint, even if later superseded, still has value as an affidavit in opposition to summary judgment).[8]  Thus, those facts will be part of the summary judgment record regardless of whether amendment is allowed, which also undermines any assertion of prejudice.  For all of these reasons, the motion to amend will be granted and what Chamberlain has called his proposed supplemental complaint will be treated as Chamberlain's second amended complaint and the operative complaint in this matter.

**B.   Motion to Amend/Correct Record (Dkt. No. 82)**

This motion, in which Chamberlain requests that the court correct duplicate exhibit numbers, also will be granted, but there is only one duplicate numbered exhibit—Plaintiff's Exhibit 7—that has been assigned to two different documents.  Accordingly, the court will order that Plaintiff's Exhibit 7, docketed at Dkt. No. 80, be renumbered as Plaintiff's Exhibit 12, such that Dkt. No. 80 will now contain Exhibit 8 through 11 and 12 (previously 7).

---

[8]  Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

Chamberlain also asks for an accounting of exhibits he has filed in the case.  Briefing on various motions has included exhibits, and not all of them are relevant or appropriate for consideration on summary judgment.  Nonetheless, the court notes that the record includes the following numbered exhibits submitted by Chamberlain:

1. Plaintiff's Exhibits 1–5 (attached to Dkt. No. 1);
2. Plaintiff's Exhibits 6 and 7 (attached to Dkt. No. 9 and attached again to Dkt. No. 14); and
3. Plaintiff's Exhibits 7–11 (Dkt. No. 80), of which Dkt. No. 7 will now be deemed Dkt. No. 12.[9]

## C. Discovery Motions (Dkt. Nos. 54, 55, 66) and Motion for Sanctions (Dkt. No. 73)

Chamberlain also has filed several motions related to discovery, and defendants have not responded to any of them.  In the first such motion, he asks that a discovery procedure be established so that he may take depositions of unspecified persons.  (Dkt. No. 54).  In another motion, he requests permission to take the deposition of Dr. McDuffie.  (Dkt. No. 55.)  In a separate motion, he asks the court to order three "non-parties" to whom he sent subpoenas for his medical records to show cause as to why they have not provided those records.  (Dkt. No. 66.)  He also contends that he needs an attorney to assist him and that his separate motion for a guardian ad litem should be granted because a guardian ad litem would have more success in obtaining records and other documents on his behalf.

Chamberlain's motion for sanctions, which also relates primarily to discovery, contains several complaints.  First, he contends that defendants wholly failed to respond to his interrogatories.  Second, he states that defendants' counsel has refused to correspond with him or to

---

[9]  The record also includes the following exhibits from Chamberlain that are identified by letters:  (1) "Reply Attachments A, B, C, and D," attached to his reply, Dkt. No. 49, as part of the briefing on his first motion for preliminary injunction; (2) Exhibits A and B, attached to the affidavit he submitted from McDuffie (Dkt. No. 53); (3) "Motion Attachment A," attached to his motion to take deposition of McDuffie (Dkt. No. 55); (4) "Motion Attachment A," attached to his motion for sanctions (Dkt. No. 73); and (5) "Affidavit Attachment A," attached to Chamberlain's Affidavit, Dkt. No. 74-2.

communicate with him regarding discovery or disclosure.  Third, he accuses defendants' counsel of "witness tampering."  This allegation is based on the various affidavits submitted by Dr. McDuffie, Dr. McDuffie's alleged statement to Chamberlain that defendants' counsel had ordered him to refrain from providing affidavits for Chamberlain, and Chamberlain's interpretation of these events as counsel ordering Dr. McDuffie to modify his professional judgment to reflect the defendants' legal interests.  Chamberlain argues that Dr. McDuffie also "specifically stated," in a November 12, 2020 appointment that "Medication Assisted Treatment is medically necessary in my medical opinion."  (Dkt. No. 73 at 2.)  He also makes general allegations that he has sought and been denied discovery, and he claims that he is unable to "acquire accurate testimony to challenge erroneous affidavits submitted in bad faith."  (*Id.* at 4.)

For relief, he asks for: (1) sanctions against defendants and their counsel; (2) an order directing counsel to "cease and desist" from interfering with Chamberlain's "expert witness, Dr. McDuffie, or other witnesses"; (3) an order compelling defendants to respond to discovery; (4) a deposition of Dr. McDuffie; and (5) appointed counsel to assist him.  (*Id.* at 5.)

Liberally construed, it appears to the court that Chamberlain is arguing that he needs discovery in order to respond to the summary judgment motion, akin to a request pursuant to Federal Rule of Civil Procedure 56(d).  He has requested his own medical records, which he says he has not been given, and his interrogatories inquire about topics (like his medical care) that are directly relevant to this Eighth Amendment claim.  Thus, the court will treat his requests for discovery as one brought under Rule 56(d), even though Chamberlain has not complied with the technical aspects of that provision.  As the Fourth Circuit has emphasized, it is particularly important in a *pro se* prisoner case, where the plaintiff's access to discovery is more limited, that courts be careful to allow for requested discovery if it could affect a summary judgment ruling.  *See,*

16

*e.g.*, *Pledger v. Lynch*, __ F. 4th __, 2021 WL 3072861, at *11 (4th Cir. July 21, 2021) (concluding district court abused its discretion in granting summary judgment on Eighth Amendment deliberate indifference claims against medical providers where plaintiff had put the district court on "fair notice of a potential dispute as to the sufficiency of the summary judgment record"); *Goodman*, 986 F.3d at 500 (vacating district court's grant of summary judgment in *pro se* prisoner case where plaintiff had outstanding discovery requests on material issues).

Accordingly, the court will allow a brief period for discovery before ruling on Chamberlain's Eighth Amendment claim, which the court concludes is the only claim possibly affected by the lack of discovery. In particular, the court will require defendants to respond to previously propounded discovery requests not later than thirty days after entry of this order. This includes responding to interrogatories previously propounded by Chamberlain. The court also will grant in part the motion to subpoena Chamberlain's medical records, insofar as defendants will be required to treat the subpoena directed to Herrick as a request for production of documents. Defendants Herrick and VDOC shall respond to that request within thirty days after entry of this opinion and order.

As for his other requests, Chamberlain's request for appointment of counsel is denied for the same reasons it previously was denied. (*See* Dkt. No. 35.) His motions for depositions of unspecified persons and for Dr. McDuffie will be denied without prejudice. Chamberlain is free to ask defendants' counsel whether she will agree to depositions. However, any deposition noted by Chamberlain would have to be paid for by him; the court does not have funds available to pay a court reporter to attend or prepare transcripts from a deposition, even for a litigant proceeding *in forma pauperis*.

His request to enforce subpoenas against non-parties also will be denied. First of all, although he states that three non-parties have not complied with subpoenas, the only subpoenas in

the record were directed to Steve Herrick, who is a defendant, the Medical Records Custodian at

Red Onion State Prison (which is effectively a duplicative request for his VDOC records), and to

the Medical Records Custodian at Roanoke Comprehensive Methadone Clinic.  (Dkt. Nos. 50, 60.)

The only "non-party" subpoena is the last of these.

A motion to compel compliance with the non-party subpoena directed toward the

Methadone Clinic is inappropriate because Chamberlain has not shown that he properly served that

subpoena.  Additionally, a subpoena to a non-party to appear and produce documents cannot be

enforced without pre-payment of certain costs that the recipient will incur to provide subpoenaed

documents.  *See* Rules 4 and 45 of the Federal Rules of Civil Procedure.  Again, the court is

unaware of any funding to allow for the payment of such fees at government expense.  *See Johnson*

*v. Hubbard*, 698 F.2d 286, 289-90 (6th Cir. 1983) (abrogation on other grounds recognized by *L &*

*W Supply Corp. v. Acuity*, 475 F.3d 737 (6th Cir. 2007).

Also, to the extent that Chamberlain requests sanctions against defendants, and particularly

any sanction for "witness tampering," the court concludes that he has not met the high standard for

obtaining sanctions nor shown any improper conduct by defendants or their counsel.  He also has

failed to comply with the requirements of Federal Rule of Civil Procedure 11.  Thus, his request for

sanctions will be denied.

**D.   Complaint of "Judicial Misconduct" (Dkt. No. 79)**

Chamberlain also filed a document telling this court that he believed the assigned magistrate

judge in the case was engaging in "judicial misconduct" because some of Chamberlain's motions

had not yet been decided.  The court has reviewed that motion and concludes that no misconduct

has occurred.  First of all, although the docket reflected that these motions were referred to the

magistrate judge, some of the motions were under consideration by the undersigned, but were going

to be addressed in conjunction with the summary judgment motion and now have been addressed.

Nonetheless, to the extent that Chamberlain believes a judicial misconduct complaint is warranted

and wants to officially complain about the conduct of either of the assigned judges to this case, he

may file any appropriate complaints with the United States Court of Appeals for the Fourth Circuit.

### E.   Motion for Guardian Ad Litem (Dkt. No. 63)

Chamberlain has also filed a motion stating that he is "incompetent" and requesting a

guardian ad litem to represent him, citing Federal Rule of Civil Procedure 17(c).  Rule 17(c)

requires the appointment of a guardian ad litem, "or another appropriate order . . . to protect a minor

or incompetent person who is unrepresented in an action."  Fed. R. Civ. P. 17(c)(2).  In another

filing, he states that he believes a guardian ad litem will assist him in obtaining discovery.

The record in this case refutes that Chamberlain is incompetent or unable to prosecute this

case himself.  To the contrary, Chamberlain has had no difficulty in communicating effectively with

the court, putting information before the court, and making requests for relief that he believes are

appropriate.  His filings do not in any way indicate incompetency, and he has presented no evidence

to the contrary.  A guardian ad litem is not, moreover, a substitute for an attorney, nor should one be

appointed simply to aid in discovery.  Accordingly, this motion will be denied.

### F.   Motion for Preliminary Injunction (Dkt. No. 85)

Chamberlain's recent motion for preliminary injunction will be taken under advisement, and

defendants will be directed to respond within forty-five days after entry of this order.

### G.   Remaining Motions

Chamberlain's motion for a ruling on open motions (Dkt. No. 75) will be denied as moot in

light of the court's rulings herein.  His motion to supplement records to the Fourth Circuit (Dkt. No.

77) also will be denied as moot because all records in the case through June 1, 2021, already have

been sent to the Fourth Circuit.

III. MOTION FOR SUMMARY JUDGMENT

**A.  Summary Judgment Standard**

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

**B.  Chamberlain's Claims**

**1.  ADA and RA Claims**

Defendants move for summary judgment as to Chamberlain's ADA and RA claims in Counts I and II on several grounds.  Because the court concludes that Chamberlain fails to present sufficient facts from which a jury could find in his favor as to either claim, the court will grant

20

defendants' motion for summary judgment solely on that ground.[10]

The Fourth Circuit recently explained the elements of an ADA claim in this context:

> Title II of the ADA provides that no qualified individual shall, "by reason of [a] disability," be denied the benefits of public "services, programs, or activities" or be subject to discrimination by a public entity. 42 U.S.C. § 12132. The term "disability" is defined by the Act to mean "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." *Id*. § 12102(1). . . . [T]o state a cause of action under Title II, an individual must plausibly allege (1) that he has a disability or has been regarded as having a disability; (2) that he is otherwise qualified to receive the benefits provided by a public entity; and (3) that he was denied those benefits or was otherwise discriminated against on the basis of his disability. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).

*Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020). The elements of an RA claim are similar, except that the RA has a heightened standard of causation, requiring that the plaintiff be denied benefits or discriminated against "solely by reason of" his disability. *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). Sometimes where claims under both statutes are at issue, the Fourth Circuit has analyzed only the ADA claim, noting that "[i]f that claims fails, the Rehabilitation Act claim must fail as well." *Id.* The court does so, as well.

Defendants contend that Chamberlain's ADA claim fails under the third element of his claim, which requires a fact-intensive and case-specific inquiry. *Bane v. Va. Dep't of Corr.*, Civil Action No. 7:12-cv-159, 2012 WL 6738274, at * 11 (W.D. Va. Dec. 28, 2012). Chamberlain

---

[10] The court notes, though, that defendants are correct that neither Title II of the ADA or the RA allows claims against individual defendants in their individual capacities. *See* 42 U.S.C. § 12132 (stating that Title II applies to "public entities"); *Baird v. Rose*, 192 F.3d 462, 471 (4th Cir. 1999) (holding that the ADA does not recognize a cause of action against employees in their individual capacities); *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (same); *Brown v. Dep't of Public Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 552 (D. Md. 2019) (collecting authority for the proposition that neither Title II of the ADA nor the RA allows for individual capacity suits against state officials). ADA claims against the individuals in their official capacities, however, are not automatically barred by Eleventh Amendment immunity. *Fauconier v. Clarke*, 966 F.3d 265, 280 (4th Cir. 2020). Defendants also are correct that any claim for money damages can succeed only if the challenged conduct actually states a constitutional violation. (*See* Dkt. No. 68 at 13 n.7 (discussing principle and citing *United States v. Georgia*, 546 U.S. at 159).)

acknowledges that some individuals with OUD receive treatment from VDOC—which undermines any claim that defendants are not giving him MAT because of his OUD—but he argues that he is not receiving proper treatment under the ADA.  An inmate's medical treatment or lack of medical treatment, however, does not give rise to an ADA claim.  *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (agreeing with the Eleventh Circuit and Tenth Circuits that a lawsuit under the RA or the ADA "cannot be based on medical treatment decisions"); *Spencer v. Easter*, 109 F. App'x 571, 573 (4th Cir. 2004) (concluding prisoner failed to state a prima facie case under Title II of the ADA because he did not present any evidence to show that the medical failure he alleged was the result of any discriminatory intent due to any alleged disability); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

Similarly, a disagreement with a reasoned medical judgment is not sufficient to state a disability discrimination claim.  *See Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 285 (1st Cir. 2006); *see also Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (explaining that where the plaintiff's disability is the reason for seeking medical treatment and he alleges that he is not receiving proper treatment for that disability, it does not give rise to a claim under the ADA or the RA).  Here, Chamberlain wants to be given specific medication and says that the medicine he is being offered is ineffective.  The medication he seeks is not "medically necessary," according to his treating physician, although his physician also has said certain those medicines would be appropriate for Chamberlain, at least in the right setting.

Chamberlain insists—and some of Dr. McDuffie's statements in his second affidavit, at least in insolation—suggest that Dr. McDuffie would recommend more or different treatment for Chamberlain if VDOC policy permitted him to do so.  Regardless of whether those allegations support an Eighth Amendment claim, though, they do not support an ADA or RA claim for the reasons discussed in the authority cited in the preceding paragraph.  Put differently, some of

VDOC's policies—which are based, at least in part, on concerns about diversion of medications and other security concerns—may deny Chamberlain what he says is the "proper" or preferred treatment for OUD, but that alone does not show that he is being discriminated against *because of* his OUD. Accordingly, summary judgment will be entered for all defendants as to Counts I and II.

### 2. Eighth Amendment Claim

Turning to Count III, which is Chamberlain's Eighth Amendment claim, "[i]t is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).  To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them."  *Id.* at 356–57.  The first component is an objective inquiry; the second is subjective.  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994).  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  To qualify as deliberate indifference, then, the health care provider's treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Unlike many Eighth Amendment claims in the prison context, Chamberlain has not named his treating medical providers as defendants.  Instead, his theory is that his physician "is certified

and willing to treat his OUD" with the medications sought by Chamberlain but is precluded from providing that treatment "by defendants' policies and procedures." (Opp'n Mot. Summ. J. 13, Dkt. No. 74.) He also has presented evidence that at least some of the defendants are aware of Dr. McDuffie's purported belief that Chamberlain would benefit from treatment with either methadone or buprenorphine, but they have refused to modify their policies to allow Chamberlain such treatment. That is the basis for his claim that they are deliberately indifferent to his serious medical needs.

As noted above, the court will allow Chamberlain discovery before ruling on this claim. Accordingly, the summary judgment motion will be denied without prejudice as to Chamberlain's Eighth Amendment claim. Defendants will be directed to file any renewed motion for summary judgment as to this claim not later than forty-five days after entry of this order. Their motion should address, in particular, Chamberlain's allegations regarding events that have transpired since the filing of their original summary judgment motion, including his treatment and any changes to VDOC's policies regarding MAT. If they elect not to file a summary judgment motion, they shall file a notice so advising, and the Eighth Amendment claim will be set for trial.

### 3. Equal Protection Claim

In Count IV, Chamberlain asserts that the denial of the specific MAT treatment he seeks is a violation of the Fourteenth Amendment's Equal Protection Clause. That clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prove an equal protection claim, a litigant "must first demonstrate that he has been treated differently from others with whom he is similarly situated." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Moreover, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003).

24

Chamberlain appears to be making two different equal protection challenges, but both of them fail.  First, he argues that he should be treated the same as persons who are on probation, about to be released, or who are being supervised in the community, despite the fact that he was (at the time he filed his complaint), a high-security level inmate with decades left to serve.  These distinctions make these prisoners not similarly situated for the purposes of an equal protection challenge.  Indeed, Chamberlain even acknowledges that persons similar to himself—in security classification, housing, and proximity to release—are receiving the same treatment that he is.  (Am. Compl 36–37.)  This equal protection claim thus fails.

For like reasons, any claim that he is being treated differently than female (or pregnant female) offenders who also have OUD fails.  Notably, when the *Veney* court affirmed the dismissal of an equal protection challenge to a prison policy that discriminated on the basis of gender, it noted legitimate differences between the security needs of male and female inmates that can justify differential treatment. *Veney*, 293 F.3d at 734 (recognizing that "each gender faces unique safety and security concerns of various degrees" and that "it is a well-documented reality that institutions for females generally are much less violent than those for males"); *see also Washington v. McAuliffe*, No. 7:16-CV-00476, 2019 WL 1371859, at *11 (W.D. Va. Mar. 26, 2019) (rejecting equal protection claim based on differences in grooming policy for men and women in light of testimony that men are more inclined to present security risks than women and that, although women fight, they rarely do so with weapons); *Ashann-Ra v. Commonwealth*, 112 F. Supp. 2d 559, 571–72 (W.D. Va. 2000) (same and citing to defendants' assertions that "female inmates are not as prone to be violent [or] to hide weapons in their hair"); *DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 328 (E.D. Va. 2000) (same), *aff'd*, 13 F. App'x 96 (4th Cir. 2001) (affirming "on the reasoning of the district court").  Here, Chamberlain is not a female, pregnant or otherwise.  Moreover, defendants have offered testimony regarding VDOC's MAT policies that point to security and other

25

justifications for allowing broader use of MAT in certain settings.  And while Chamberlain claims

that these security concerns are overblown by defendants, he nonetheless has failed to show any

facts to establish an "improper motive."  *See Williams*, 326 F.3d at 584.  For all these reasons,

defendants are entitled to summary judgment as to Chamberlain's equal protection claim.

## IV. CONCLUSION

For the reasons discussed above, the court will rule on the motions in this case as set forth in

this opinion.  An appropriate order will be entered.

Entered: September 9, 2021.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge